**ORAL ARGUMENT NOT YET SCHEDULED**

**Case No. 18-1172 (consolidated with Case No. 18-1174)**

United States Court of Appeals
for the District of Columbia Circuit

NATURAL RESOURCES DEFENSE COUNCIL,

*Petitioner,*

v.

ANDREW WHEELER, ACTING ADMINISTRATOR, U.S. ENVIRONMENTAL
PROTECTION AGENCY, ET AL.,

*Respondents.*

PETITION FOR REVIEW OF FINAL ACTION BY THE
UNITED STATES ENVIRONMENTAL PROTECTION AGENCY

**OPENING PROOF BRIEF FOR STATE PETITIONERS**

MICHAEL J. MYERS
  *Senior Counsel*
MORGAN A. COSTELLO
  *Chief, Affirmative Litigation*
JOSHUA M. TALLENT
  *Assistant Attorney General*
Environmental Protection Bureau

(additional counsel listed in
signature blocks)

BARBARA D. UNDERWOOD
  *Attorney General*
  *of the State of New York*
STEVEN C. WU
  *Deputy Solicitor General*
Attorneys for State Petitioners
Albany, New York 12224-0341
(518) 776-2456
Joshua.Tallent@ag.ny.gov

Dated: November 7, 2018

# CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

Pursuant to Circuit Rule 28(a)(1), the undersigned counsel of record certifies as follows:

## A.   Parties

*Petitioners*

The following parties appear in these consolidated cases as petitioners:

In Case No. 18-1172, filed on June 26, 2018, Natural Resources Defense Council.

In Case No. 18-1174, filed on June 28, 2018, the State of New York; the State of California; the State of Delaware; the State of Illinois; the Commonwealth of Massachusetts; the State of Minnesota, by and through its Minnesota Pollution Control Agency; the State of New Jersey; the State of Oregon; the Pennsylvania Department of Environmental Protection; the State of Vermont; the State of Washington; and the District of Columbia ("State Petitioners").

*Respondents*

Andrew Wheeler, as Acting Administrator of the Environmental Protection Agency ("EPA"), and the EPA.

i

*Intervenors*

Arkema Inc., Mexichem Fluor, Inc., and the National Environmental Development Association's Clean Air Project have been granted leave to intervene on behalf of the respondents.

**B.   Amici in this Case**

There are presently no amici.

**C.   Ruling Under Review**

State Petitioners seek review of a final EPA action entitled "Protection of Stratospheric Ozone: Notification of Guidance and a Stakeholder Meeting Concerning the Significant New Alternatives Policy (SNAP) Program," published at 83 Fed. Reg. 18,431 (Apr. 27, 2018).

**D.   Related Cases**

The foregoing EPA action has not been reviewed in this or any other court.  The action responds to a decision of this Court partially vacating and remanding another EPA rule, "Protection of Stratospheric Ozone: Change of Listing Status for Certain Substitutes Under the Significant New Alternatives Policy Program," published at 80 Fed. Reg. 82,870 (July 20, 2015).  *See Mexichem Fluor, Inc. v. EPA*, 866 F.3d 451 (D.C. Cir. 2017) (vacating in part), *cert denied* 2018 WL 3127416 (Oct. 9, 2018).

ii

Petitions are also pending before the Court challenging a separate but related EPA rule, "Protection of Stratospheric Ozone: New Listings of Substitutes; Changes of Listing Status; and Reinterpretation of Unacceptability for Closed Cell Foam Products Under the Significant New Alternatives Policy Program; and Revision of Clean Air Act Section 608 Venting Prohibition for Propane," published at 81 Fed. Reg. 86,778 (Dec. 1, 2016). *See Mexichem Fluor, Inc. v. EPA* (*Mexichem II*), D.C. Cir. Case Nos. 17-1024, 17-1030.

_____
Joshua M. Tallent
Assistant Attorney General
Environmental Protection
  Bureau
New York State Office of the
  Attorney General
The Capitol
Albany, NY 12224
(518) 776-2456
Joshua.Tallent@ag.ny.gov
*Counsel for State Petitioners*

iii

# TABLE OF CONTENTS

CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES ....................................................................................... i

TABLE OF AUTHORITIES ................................................................ vi

GLOSSARY ........................................................................................ xi

PRELIMINARY STATEMENT .......................................................... 1

JURISDICTIONAL STATEMENT .................................................... 3

ISSUES PRESENTED ....................................................................... 4

STATUTES AND REGULATIONS .................................................. 5

STATEMENT OF THE CASE ........................................................... 5

    A.   EPA's Significant New Alternatives Policy (SNAP) Program ...... 5

    B.   HFCs and the 2015 Rule .................................................... 8

    C.   The *Mexichem* Decision ................................................. 11

    D.   EPA's SNAP Guidance ..................................................... 12

    E.   The Instant Proceedings .................................................. 14

STANDARD OF REVIEW ................................................................ 14

SUMMARY OF ARGUMENT .......................................................... 15

STANDING ........................................................................................ 18

    A.   The SNAP Guidance Will Increase HFC Emissions ................... 19

    B.   Increased HFC Emissions Will Injure State Petitioners' Proprietary Interests ................................................................ 22

iv

C.    Increased HFC Emissions Will Injure State Petitioners'
      Quasi-sovereign Interests ...........................................................24

ARGUMENT ................................................................................................25

POINT I .......................................................................................................25

EPA UNLAWFULLY ISSUED THE SNAP GUIDANCE
WITHOUT NOTICE AND AN OPPORTUNITY FOR PUBLIC
COMMENT ..................................................................................................25

A.    The SNAP Guidance Is a Final Agency Action Subject To
      Judicial Review ...........................................................................26

B.    The SNAP Guidance Is a Legislative Rule Subject To
      Notice-and-Comment Requirements ............................................30

C.    EPA Unlawfully Issued the SNAP Guidance Without
      Notice Or an Opportunity for Public Comment .........................33

POINT II .....................................................................................................36

THE SNAP GUIDANCE IS ARBITRARY AND CAPRICIOUS ............36

CONCLUSION ............................................................................................41

CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME
LIMIT ..........................................................................................................45

CERTIFICATE OF SERVICE.....................................................................46

v

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Air Alliance Houston v. EPA*,
　No. 17-1155, 2018 WL 4000490 (D.C. Cir. Aug. 17, 2018) .......... 24, 40

*American Mining Congress v. Mine Safety & Health Admin.*,
　995 F.2d 1106 (D.C. Cir. 1993) ........................................................ 31

*Barrick Goldstrike Mines, Inc. v. Browner*,
　215 F.3d 45 (D.C. Cir. 2000) ..................................................... 27, 29

*Bennett v. Spear*,
　520 U.S. 154 (1997) .............................................................. 27, 29, 30

*Catawba County v. EPA*,
　571 F.3d 20 (D.C. Cir. 2009) ........................................................... 31

*Cement Kiln Recycling Coalition v. EPA*,
　493 F.3d 207 (D.C. Cir. 2007) ......................................................... 30

*Clean Air Council v. Pruitt*,
　862 F.3d 1 (D.C. Cir. 2017) ....................................................... 14, 33

*Encino Motorcars, LLC v. Navarro*,
　136 S.Ct. 2117 (2016) .......................................................... 14, 15, 36

*FCC v. Fox Television Stations, Inc.*,
　556 U.S. 502 (2009) .............................................................. 15, 37, 40

*General Electric v. EPA*,
　290 F.3d 377 (D.C. Cir. 2002) ............................................ 14, 28, 36

*Honeywell Int'l, Inc. v. EPA*,
　374 F.3d 1363 (D.C. Cir. 2004), modified 393 F.3d 1315
　(D.C. Cir. 2005) ................................................................................ 7

*Massachusetts v. EPA*,
　549 U.S. 497 (2007) ..................................................................... 24, 25

*Mexichem Fluor, Inc. v. EPA,
    866 F.3d 451 (D.C. Cir. 2017), cert denied
    2018 WL 3127416 (Oct. 9, 2018)..................1, 4, 7, 8, 11, 12, 33, 37, 38

Molycorp, Inc. v. EPA,
    197 F.3d 543 (D.C. Cir. 1999) ............................................................ 31

*Motor Vehicle Mfg. Ass'n v. State Farm Mut. Ins. Co.,
    463 U.S. 29 (1983) ............................................................................... 36

Natural Resources Defense Council v. EPA,
    464 F.3d 1 (D.C. Cir. 2006) .................................................................. 5

Natural Resources Defense Council v. EPA,
    643 F.3d 311 (D.C. Cir. 2011) ....................................................... 27, 30

Perez v. Mortgage Bankers Ass'n,
    135 S.Ct. 1199 (2015)..................................................................... 14, 33

Public Citizen v. Steed,
    733 F.2d 93 (D.C. Cir. 1984) .............................................................. 40

Sierra Club v. EPA,
    699 F.3d 530 (D.C. Cir. 2012) ............................................................ 30

Sierra Club v. EPA,
    873 F.3d 946 (D.C. Cir. 2017) ............................................................ 31

Small Refiner Lead Phase-Down Task Force v. EPA,
    705 F.2d 506 (D.C. Cir. 1983) ............................................................ 34

Sugar Cane Growers Co-op of Florida. v. Veneman,
    289 F.3d 89 (D.C. Cir. 2002) .............................................................. 34

United States Army Corps of Engineers v. Hawkes Co., Inc.,
    136 S.Ct. 1807 (2016).......................................................................... 30

Utility Air Regulatory Group v. EPA,
    744 F.3d 741 (D.C. Cir. 2014) ............................................................ 14

West Virginia v. EPA,
    362 F.3d 861 (D.C. Cir. 2004) ............................................................ 23

vii

*Whitman v. Am. Trucking Ass'n*,
    531 U.S. 457 (2001) ............................................................ 27

*Williams Gas Processing – Gulf Coast Co., L.P. v. FERC*,
    373 F.3d 1335 (D.C. Cir. 2004) ........................................ 35

**FEDERAL STATUTES**

5 U.S.C.
    § 553(b)(A) ................................................................. 35, 36

42 U.S.C.
    § 7607(b) ............................................................................. 3
    § 7607(b)(1) ............................................................... 15, 26
    § 7607(d) .......................................................................... 25
    *§ 7607(d)(1)(I), (d)(3), (d)(5), (d)(6) ......................... 16, 33
    § 7607(d)(8) .................................................................... 35
    *§ 7607(d)(9)(A) ..................................................... 4, 14, 36
    *§ 7607(d)(9)(D) ................................................ 4, 14, 26, 36
    § 7671(c) ............................................................................ 6
    § 7671a .............................................................................. 6
    § 7671c .............................................................................. 6
    § 7671d .............................................................................. 6
    § 7671e .............................................................................. 6
    § 7671k(a) .......................................................................... 6
    § 7671k(c) .......................................................................... 7

**STATE STATUTES**

Mass. Gen. Laws ch. 21N
    §§ 3(b), 4(a) .................................................................... 22

Wash. Rev. Code
    § 70.235.020(1)(a) .......................................................... 22

**FEDERAL REGULATIONS**

40 C.F.R. pt. 82, subpt. G, app. U ........................................ 10

40 C.F.R.

    § 82.172 ................................................................................. 8
    § 82.174(d) .................................................................. 7, 8, 29
    § 82.180(7) ........................................................................... 7

58 Fed. Reg. 65,018, 65,025 (Dec. 10, 1993) ............................... 6

59 Fed. Reg. 13,044, 13,044 (Mar. 18, 1994) ......................... 5, 7, 8, 9, 37

80 Fed. Reg. 42,870 (July 20, 2015) ..... 4, 7, 8, 9, 10, 20, 21, 29, 37, 38, 39

83 Fed. Reg. 18,431 (Apr. 27, 2018) ...................... 3, 12, 13, 16, 28, 29, 37

## RULES

Circuit Rule 32(e)(1) .................................................................. 45

Fed. R. App. P. 32(a)(5) ............................................................. 45

Fed. R. App. P. 32(a)(6) ............................................................. 45

Fed. R. App. P. 32(a)(7)(B)(i) ..................................................... 45

Fed. R. App. P. 32(f) .................................................................. 45

## MISCELLANEOUS AUTHORITIES

EPA-HQ-OAR-2014-0198, IPCC/TEAP Special Report on
    Safeguarding the Ozone Layer and the Global Climate
    System (2005) .................................................................... 9

EPA-HQ-OAR-201-0198, Market Characterization of the
    U.S. Aerosols Industry, U.S. Motor Vehicle Air
    Conditioning Industry, U.S. Commercial Refrigeration
    Industry, and U.S. Foams Industry (July 2015) ................................ 21

EPA-HQ-OAR-2015-0453-0225, Technical Support
    Document: Analysis of the Economic Impact and Benefits
    of Final Revisions to the National Recycling and Emission
    Reduction Program (Sept. 2, 2016) ........................................ 19, 20

Exec. Order No. 166 (June 1, 2017) ........................................ 22

(Page 10 of Total)

IPCC, Global Warming of 1.5°C at 2-38 (Oct. 2018),
    http://report.ipcc.ch/sr15/pdf/sr15_chapter2.pdf ................................ 25

Pub. L. No. 101-549 (101st Cong., 2nd Sess.) ........................................... 6

*Authorities upon which we chiefly rely are marked with an asterisk.

# GLOSSARY

| | |
|---|---|
| Act | Clean Air Act |
| APA | Administrative Procedure Act |
| CFCs | Chlorofluorocarbons |
| EPA | U.S. Environmental Protection Agency |
| HCFCs | Hydrochlorofluorocarbons |
| HFCs | Hydrofluorocarbons |
| IPCC | Intergovernmental Panel on Climate Change |
| JA | Joint Appendix |
| Protocol | Montreal Protocol on Substances that Deplete the Ozone Layer |
| SNAP Guidance | Protection of Stratospheric Ozone: Notification of Guidance and a Stakeholder Meeting Concerning the Significant New Alternatives Policy (SNAP) Program, 83 Fed. Reg. 18,431 (Apr. 27, 2018) |
| SNAP Program | Protection of Stratospheric Ozone, 59 Fed. Reg. 13,044 (March 18, 1994) |
| State Petitioners | The State of New York, the State of California, the State of Delaware, the State of Illinois, the Commonwealth of Massachusetts, the State of Minnesota by and through its Minnesota Pollution Control Agency, the State of New Jersey, the State of Oregon, the Pennsylvania Department of Environmental Protection, the State of Vermont, the State of Washington, and the District of Columbia |

xi

2015 Rule                Protection of Stratospheric Ozone: Change of
                         Listing Status for Certain Substitutes Under the
                         Significant New Alternatives Policy Program, 80
                         Fed. Reg. 82,870 (July 20, 2015)

## PRELIMINARY STATEMENT

State Petitioners challenge an EPA guidance document that effectively rescinds an existing final rule limiting the use of hydrofluorocarbons ("HFCs")—a class of chemicals with powerful greenhouse effects—as substitutes for restricted ozone-depleting chemicals. EPA justifies this rescission as necessary to implement a recent decision from this Court, *Mexichem Fluor, Inc. v. EPA*, 866 F.3d 451 (D.C. Cir. 2017), *cert denied* 2018 WL 3127416 (Oct. 9, 2018), resolving various challenges to the underlying final rule. But as EPA admits, the *Mexichem* decision only *partially* vacated the rule; the Court expressly *upheld* other discrete applications of the rule, leaving those applications unaffected by the partial vacatur. By nonetheless ordering a wholesale abrogation of the underlying rule's HFC use restrictions, EPA's guidance document exceeds the scope of the Court's ruling and thus effects a significant and substantive alteration of an extant, duly promulgated regulation.

This Court should invalidate the guidance document for either of two independent reasons. First, EPA made no effort to provide notice or an opportunity for public comment before issuing the guidance. Because

1

the guidance effects a substantive change in the underlying regulatory scheme in a way the *Mexichem* decision did not require, EPA's failure to comply with the Clean Air Act's procedural mandates renders the guidance unlawful.

Second, even disregarding EPA's procedural violation, the guidance should be vacated because it is arbitrary and capricious. EPA justifies its wholesale nullification of the underlying rule's HFC use restrictions as an effort to implement the *Mexichem* decision, but it makes no sense to base a total abrogation of the underlying rule on the Court's partial vacatur—particularly when the Court specifically upheld certain applications of the rule and confirmed EPA's statutory authority to implement it. EPA asserts various difficulties in revising its existing regulations to implement *Mexichem*'s partial vacatur, but none of these purported obstacles would have prevented EPA from issuing guidance that simply adheres to *Mexichem*'s holdings. And, in any event, a total abrogation of the 2015 Rule's HFC use restrictions—with no set endpoint—is an unreasonable and disproportionate response to EPA's stated concerns about drafting difficulties.

2

EPA also fails to explain why rescission of the underlying rule's HFC use restrictions is adequately protective of human health and the environment.  In a prior rulemaking, EPA curtailed the use of certain HFCs based on a determination that the chemicals pose a greater overall threat to human health and the environment than other available substitutes for ozone-depleting substances in certain end-uses—a determination this Court upheld.  EPA does not repudiate those factual findings in the guidance, nor does it consider—let alone justify—the harms sure to flow from its rescission of the underlying rule's HFC use restrictions.  EPA's guidance is thus arbitrary and capricious and must be vacated.

## JURISDICTIONAL STATEMENT

Under section 307(b) of the Clean Air Act (the "Act"), this Court has exclusive jurisdiction to review "any . . . nationally applicable regulation[] promulgated, or final action taken, by the [EPA] Administrator" pursuant to, *inter alia*, section 612 of the Act.  42 U.S.C. § 7607(b).

State Petitioners challenge the EPA final action entitled "Protection of Stratospheric Ozone: Notification of Guidance and a Stakeholder Meeting Concerning the Significant New Alternatives Policy

3

(SNAP) Program" ("SNAP Guidance"), 83 Fed. Reg. 18,431 (Apr. 27, 2018). The SNAP Guidance purports to implement this Court's partial vacatur of the EPA rule "Protection of Stratospheric Ozone: Change of Listing Status for Certain Substitutes Under the Significant New Alternatives Policy Program" ("2015 Rule"), 80 Fed. Reg. 42,870 (July 20, 2015). *See Mexichem*, 866 F.3d at 462. State Petitioners filed a petition for review of the SNAP Guidance within the sixty-day period provided under section 307(b) of the Act.

## ISSUES PRESENTED

1. Whether the SNAP Guidance was unlawfully promulgated without notice or an opportunity for public comment in violation of 42 U.S.C. § 7607(d)(9)(D)?

2. Whether EPA's failure to offer a reasoned explanation for its decision to nullify the HFC use restrictions specifically upheld by the Court in *Mexichem* renders the SNAP Guidance arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law in violation of 42 U.S.C. § 7607(d)(9)(A)?

## STATUTES AND REGULATIONS

Relevant statutory and regulatory provisions are contained in the Addendum at the end of this brief.

## STATEMENT OF THE CASE

### A.   EPA's Significant New Alternatives Policy (SNAP) Program

The stratospheric ozone layer shields Earth's surface from harmful ultraviolet radiation.  In the mid-1970s, scientists discovered that certain chemicals, once emitted into the atmosphere, were degrading the ozone layer. *See Natural Resources Defense Council v. EPA*, 464 F.3d 1, 3 (D.C. Cir. 2006).  As the ozone layer thinned, it absorbed less ultraviolet radiation, increasing radiation exposure on the planet's surface.  Over-exposure to ultraviolet radiation is linked, among other harms, to increased incidences of skin cancer and cataracts.  *See generally* Protection of Stratospheric Ozone, 59 Fed. Reg. 13,044, 13,044 (Mar. 18, 1994).

To stop the ozone-depletion process and protect the ozone layer, the United States and a number of other countries entered into the Montreal Protocol on Substances that Deplete the Ozone Layer ("Protocol").  *See id.*  The Protocol requires signatories to reduce and, ultimately, eliminate

5

production and use of ozone-depleting chemicals. *See NRDC v. EPA*, 464 F.3d at 3. The Senate ratified the Protocol in 1988 and Congress incorporated its terms into law through the Clean Air Act Amendments of 1990. *See* Pub. L. No. 101-549, 104 Stat. 2399, 2649–72 (1990).

Title VI of the Clean Air Act gradually phases out production and use of certain ozone-depleting substances, principally chlorofluorocarbons ("CFCs") and hydrochlorofluorocarbons ("HCFCs"). *See* 42 U.S.C. §§ 7671c–7671e.[1] Pursuant to section 612 of the Act, EPA must promulgate regulations to ensure that chemicals chosen as substitutes for prohibited ozone-depleting substances will themselves reduce overall risk to human health and the environment. *See id.* § 7671k(a), (c). Section 612(c) thus requires EPA to publish lists identifying prohibited substitutes and safe alternatives and makes it

---

[1] CFCs and HCFCs are classified under Title VI as "class I substances" and "class II substances" respectively. *See* 42 U.S.C. § 7671a. Production and consumption of CFCs have been effectively banned since the early 2000s. *See id.* § 7671c. HCFCs, however, are subject to a longer phase-out period and may still be used in certain applications. *See id.* § 7671d. For example, until January 1, 2020, new (as opposed to reclaimed) HCFCs may lawfully be used to service existing HCFC-using supermarket refrigeration equipment. After January 1, 2020, such equipment may only be serviced with recycled or stockpiled HCFCs. *See* 58 Fed. Reg. 65,018, 65,025 (Dec. 10, 1993).

6

unlawful to "replace any [ozone-depleting] substance with any substitute substance" EPA has listed as a prohibited substitute. *See id.* § 7671(c). The lists are not immutable: "[I]f EPA places a substance on the list of safe substitutes, EPA may later change its classification and move the substance to the list of prohibited substitutes." *Mexichem*, 866 F.3d at 455.

In 1994, EPA promulgated the Significant New Alternatives Policy program ("SNAP Program") to implement section 612. *See* 59 Fed. Reg. at 13,044, *codified as amended at* 40 C.F.R. § 82.170 *et seq.* The SNAP Program "establishes criteria and procedures for listing chemicals as approved substitutes for chemicals phased out pursuant to [Title VI]." *Honeywell Int'l, Inc. v. EPA*, 374 F.3d 1363, 1365–66 (D.C. Cir. 2004), *modified* 393 F.3d 1315 (D.C. Cir. 2005). Under the SNAP Program, EPA evaluates potential substitutes using a comparative risk framework accounting for such risk factors as ozone depletion potential, occupational risk, and "atmospheric effects and related health and environmental impacts." 40 C.F.R. § 82.180(7); *see* 42 U.S.C. § 7671k(c); 80 Fed. Reg. at 42,876–78. "No person may use a substitute after the effective date of any rulemaking adding such substitute to the list of unacceptable

7

substitutes." 40 C.F.R. § 82.174(d). The Program defines "use" broadly to mean "any use of a substitute for a[n] . . . ozone-depleting compound, including but not limited to use in a manufacturing process or product, in consumption by the end-user, or in intermediate uses, such as formulation or packaging for other subsequent uses." *Id.* § 82.172.

In the rulemaking implementing the SNAP Program, EPA specifically addressed whether a user that had *already* replaced a prohibited ozone-depleting substance with a non-ozone-depleting substance was still subject to the SNAP Program's use restrictions. EPA's answer was "yes": "class I and II substances are 'replaced' within the meaning of section 612(c) each time a substitute is used, so that once EPA identifies an unacceptable substitute, any future use of such substitute is prohibited." 59 Fed. Reg. at 13,048.

## B.    HFCs and the 2015 Rule

Like ozone-depleting substances, HFCs are powerful greenhouse gases; unlike ozone-depleting substances, HFCs do not themselves deplete the ozone layer. *See Mexichem*, 866 F.3d at 455; *see also* 80 Fed. Reg. at 42,879. Because HFCs are potential substitutes for ozone-depleting substances in many applications, EPA initially listed certain

8

HFCs under the SNAP Program as safe "near-term" alternatives in certain end-uses, including retail food refrigeration.[2]  *See* 59 Fed. Reg. at 13,072, 13,122–46.  It did, however, express its concern that "rapid expansion of the use of some HFCs could contribute to global warming." *Id.* at 13,071.

As other, less climate-harming HFC alternatives emerged, *see, e.g.*, 80 Fed. Reg. at 42,904, and as it developed a better understanding of the negative environmental and public health effects of high-global-warming-potential HFCs, *see* 80 Fed. Reg. at 42,879,[3] EPA perceived the need to reevaluate its initial HFC listing decisions.  *See* 80 Fed. Reg. at 42,871.  In keeping with its statutory duty to evaluate potential alternatives for ozone-depleting substances using a comparative risk framework, EPA promulgated the 2015 Rule to reclassify certain HFCs as unacceptable substitutes for ozone-depleting substances (or as

---

[2]  The retail food refrigeration end-use includes, as relevant here, large rack systems and remote condensing units commonly used in supermarkets to refrigerate or freeze food.  *See* 80 Fed. Reg. at 42,900–01.

[3]  HFCs' global warming potential ranges, depending on the particular chemical, from a low of 122 times to a high of over 14,000 times that of carbon dioxide.  *See* EPA-HQ-OAR-2014-0198, IPCC/TEAP Special Report on Safeguarding the Ozone Layer and the Global Climate System (2005) at 8, JA__.

9

acceptable substitutes subject to use conditions, or acceptable substitutes subject to narrowed use limits) in certain end-uses in the aerosols, refrigeration and air conditioning, and foam blowing sectors. *See* 80 Fed. Reg. at 42,871; *see also* 40 C.F.R. pt. 82, subpt. G, app. U. In the retail food refrigeration end-use, the rule altered the listing status for multiple HFCs previously listed as acceptable substitutes for retrofits of existing supermarket rack systems and remote condensing units and for new supermarket rack systems and remote condensing units. *See* 80 Fed. Reg. at 42,872. In the preamble to the 2015 Rule, EPA noted that, if left unregulated, "HFC emissions [we]re projected to increase substantially and at an increasing rate over the next several decades." *See id.* at 42,879.

As in the 1994 rulemaking, EPA specifically addressed whether the 2015 Rule's HFC use restrictions apply when a user has already replaced an ozone-depleting substance. EPA again explained that prohibitions on the use of unacceptable substitutes under section 612 apply "each time a substitute is used," not merely the first time a substitute replaces an ozone-depleting substance. *Id.* at 42,936.

10

### C.    The *Mexichem* Decision

In *Mexichem*, as relevant here, industry petitioners raised two related challenges to the 2015 Rule.  First, petitioners objected to EPA's decision to reclassify HFCs as prohibited substitutes for ozone-depleting substances in certain specified end-uses.  The Court unanimously rejected this challenge, holding that EPA had statutory authority to reclassify HFCs and that its decision to limit HFC use was a reasonable one.  *See Mexichem*, 866 F.3d at 460, 462–64.  As a result, the Court squarely upheld the 2015 Rule insofar as it "prohibit[s] any manufacturers that *still use* ozone-depleting substances . . . covered under Title VI from deciding in the future to replace those substances with HFCs."  *Id.* at 460 (emphasis added).  The Court indicated that its holding applies not only to product manufacturers, but "to any regulated part[y] that must replace ozone-depleting substances within the timelines specified by Title VI."  *Id.* at 457 n.1.

Second, petitioners objected to EPA's application of the HFC use restrictions to manufacturers that had *already* replaced ozone-depleting substances with non-ozone-depleting substances, including HFCs.  Over Judge Wilkins' dissent, the Court accepted petitioners' arguments,

11

holding that EPA lacked authority under section 612 to require product manufacturers to replace non-ozone-depleting substances like HFCs with safer alternative substances. *See id.* at 454. Accordingly, the Court partially vacated the 2015 Rule "to the extent [it] require[d] manufacturers to replace HFCs with a substitute substance" and remanded to EPA for further proceedings. *Id.* at 464.

Following this Court's denial of petitions for rehearing or rehearing *en banc*, industry and environmental intervenor-respondents petitioned the Supreme Court for a writ of certiorari. New York and several other State Petitioners submitted a brief as *amici curiae* in support. The petitions were denied. *See* 2018 WL 3127416 (Oct. 9, 2018).

### D.    EPA's SNAP Guidance

Following the *Mexichem* decision and without providing notice or an opportunity for public comment, EPA published a "notification of guidance" purporting to implement the Court's partial vacatur of the 2015 Rule. *See* 83 Fed. Reg. at 18,431. Although EPA recognized in the SNAP Guidance that "the [C]ourt [had] rejected the 'arbitrary and capricious' challenges to the [2015 Rule's] HFC listing changes," it nevertheless elected to "implement the [C]ourt's vacatur by treating it as

12

striking the HFC listing changes in the 2015 Rule *in their entirety*"—
meaning that the 2015 Rule's HFC use restrictions will no longer apply
even to current users of ozone-depleting substances. *Id.* at 18,435
(emphasis added). In EPA's view, because neither the SNAP Program
nor the 2015 Rule distinguishes between users that currently use ozone-
depleting substances and those that have already switched to an
approved substitute, it would be impossible for the agency to implement
the Court's partial vacatur without engaging in further rulemaking. *See
id.* at 18,433–34. EPA indicated that it "anticipates" "address[ing] the
[C]ourt's remand of the 2015 Rule through [such] rulemaking" in the
future. *Id.* at 18,431, 18,433. In the meantime, EPA declared the 2015
Rule's HFC use restrictions to be entirely without effect. *See id.* at
18,432.

More than six months have passed since EPA issued the SNAP
Guidance. In that time, EPA has not released even a proposed rule
addressing the *Mexichem* decision or revisiting the 2015 Rule.

13

### E.     The Instant Proceedings

NRDC and State Petitioners filed separate petitions challenging the SNAP Guidance within the statutory period for such a challenge.  The Court consolidated the proceedings under Case No. 18-1172.

### STANDARD OF REVIEW

A final EPA action taken under the Clean Air Act will be vacated if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," or if it was promulgated "without observance of procedure required by law."  42 U.S.C. § 7607(d)(9)(A), (D); *see Utility Air Regulatory Group v. EPA*, 744 F.3d 741, 747 (D.C. Cir. 2014).

Amending or rescinding a duly promulgated final rule without notice or an opportunity for public comment is reversible error.  *See, e.g.*, *Clean Air Council v. Pruitt*, 862 F.3d 1, 9 (D.C. Cir. 2017); *General Electric Co. v. EPA*, 290 F.3d 377, 385 (D.C. Cir. 2002); *see also Perez v. Mortgage Bankers Ass'n*, 135 S.Ct. 1199, 1206 (2015).

Agencies must provide a reasoned explanation for changes in existing policies.  *See Encino Motorcars, LLC v. Navarro*, 136 S.Ct. 2117, 2125 (2016).  An agency seeking to change existing policy "must at least display awareness that it is changing position and show that there are

14

good reasons for the new policy." *Id.* at 2126 (internal quotation marks and citation omitted). "An agency may not . . . depart from a prior policy *sub silentio* or simply disregard rules that are still on the books." *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009). "[U]nexplained inconsistency in agency policy" is a basis for finding agency action to be arbitrary and capricious. *Encino Motorcars, LLC*, 136 S.Ct. at 2126 (internal quotation marks and citation omitted).

## SUMMARY OF ARGUMENT

**Point I.** The SNAP Guidance is contrary to law because it is a final agency action substantively revising a duly promulgated EPA rule without notice and an opportunity for public comment.

As a threshold matter, the SNAP Guidance is a final agency action subject to judicial review. *See* 42 U.S.C. § 7607(b)(1). The SNAP Guidance represents EPA's definitive position on the question whether HFCs are acceptable substitutes for ozone-depleting substances for any user in the relevant end-uses. Because the SNAP Guidance has the legal effect of shifting certain HFCs from the prohibited list back to the safe alternatives list, and because regulated entities may now replace ozone-depleting substances with HFCs in reliance on this re-designation, the

15

SNAP Guidance has direct and immediate effects on both regulated entities' and EPA's rights and obligations. Accordingly, the SNAP Guidance is a final agency action subject to judicial review.

The SNAP Guidance is also a substantive revision of the 2015 Rule subject to notice and public comment under section 307(d) of the Act. *See id.* § 7607(d)(1)(I), (d)(3), (d)(5), (d)(6). By abrogating the Rule's HFC listing changes "in their entirety," 83 Fed. Reg. at 18,435, the SNAP Guidance makes substantive changes to the 2015 Rule that go well beyond what this Court ordered in *Mexichem*. EPA cannot implement such substantive changes without providing notice and an opportunity for public comment.

There is no dispute that EPA failed to follow those procedural requirements here. Because EPA failed to follow statutorily mandated procedures in issuing the SNAP Guidance and because the requirements for procedural-error vacatur in section 307(d)(9)(D) are met or inapplicable, the Guidance is unlawful and must be vacated pursuant to section 307(d)(9)(D) of the Act.

**Point II.** Even if the SNAP Guidance were procedurally proper, it is arbitrary and capricious and must be vacated.

16

EPA justified the SNAP Guidance as an implementation of this Court's order in *Mexichem*. But that rationale is plainly insufficient because the SNAP Guidance exceeds what the *Mexichem* order required. EPA's further complaints about the difficulties of implementing *Mexichem*'s partial vacatur are overstated and unsubstantiated. Nothing prevents EPA from issuing guidance—as it has done for prior section 612 rules—straightforwardly implementing this Court's holding. And whatever difficulties there may be in implementing *Mexichem*, it was unreasonable and disproportionate for EPA to respond by imposing an indefinite and total abrogation of the 2015 Rule's HFC use restrictions.

The SNAP Guidance is also arbitrary and capricious because it entirely disregards—indeed, fails to even acknowledge—the important policy goals enunciated in section 612 and furthered by the 2015 Rule. EPA promulgated the 2015 Rule in part based on its determination that HFC use in certain applications poses a greater risk to human health and the environment than the use of other available substitutes for ozone-depleting substances. The SNAP Guidance abrogates the 2015 Rule's HFC listing changes wholesale, yet it makes no attempt to reconcile this sweeping change in position with EPA's prior determination that the

17

continued use of high-global-warming-potential HFCs in the relevant end-uses poses a serious and growing threat to public health and the environment.

Because EPA failed to articulate a reasoned justification for the policy change set forth in the SNAP Guidance, the Guidance is arbitrary and capricious and must be vacated pursuant to section 307(d)(9)(A) of the Act.

## STANDING

State Petitioners have Article III standing to challenge the SNAP Guidance. By authorizing a significant increase in HFC emissions, the Guidance will do concrete harm to State Petitioners' interest in protecting their residents and their publicly owned property from threats related to climate change. And by hampering efforts to meet state greenhouse gas emissions-reduction mandates and targets, the SNAP Guidance will force New York and other State Petitioners to expend scarce resources to procure necessary emissions reductions by other, potentially more costly and less ideal means, including through state legislation and rulemaking.

18

## A.     The SNAP Guidance Will Increase HFC Emissions

State Petitioners conservatively estimate that the SNAP Guidance will result in at least an additional 199.1 million metric tons of carbon dioxide-equivalent emissions nationally by 2030.  *See* Declaration of Glenn Gallagher ("Gallagher Decl.") at ¶ 7.  In New York alone, the Guidance will result in over eleven million metric tons of additional pollution by 2030.  *See id.*

A substantial portion of the increased HFC emissions attributable to the SNAP Guidance will come from leaking supermarket refrigeration systems.   EPA estimates that there were approximately 368,565 individual refrigeration units in the commercial refrigeration sector as of 2016; of those units, approximately eighty-two percent were supermarket rack systems and ten percent were remote condensing units with a refrigerant charge of at least fifty pounds.  *See* EPA-HQ-OAR-2015-0453-0225, Technical Support Document: Analysis of the Economic Impact and Benefits of Final Revisions to the National Recycling and Emission Reduction Program (Sept. 2, 2016) at 11, 19, JA__, __.  EPA estimated that fifty-one percent of rack systems and forty-one percent of remote condensing units used ozone-depleting refrigerants.  *See id.* at 11, JA__.

19

Accordingly, out of some 302,000 rack systems, approximately 154,000 used an ozone-depleting substance as a refrigerant; for remote condensing units with at least fifty pounds of refrigerant (which is by no means all remote condensing units), some 15,000 units used an ozone-depleting refrigerant.  According to EPA, the average annual leak rate across the commercial refrigeration sector was fourteen percent as of 2013.  *See id.* at 21.  Because the number of supermarkets and grocery stores accurately tracks population, *see* Gallagher Decl. at ¶ 12, many of these leaking refrigeration units are in State Petitioners' states.

Over time, refrigeration equipment degrades and must be either retrofitted or replaced.  *See id.* at ¶ 11 (explaining equipment survival curve).  Under the portions of the 2015 Rule upheld in *Mexichem*, users of ozone-depleting substances in covered end-uses are prohibited from switching to certain HFC-based refrigerants.  This prohibition applies to existing supermarkets with rack systems and/or remote condensing units using ozone-depleting refrigerants.  *See* 80 Fed. Reg. at 42,872.  The prohibition should also apply to new or greenfield supermarkets (a *new* supermarket cannot reasonably be said to have already replaced ozone-depleting refrigerants with an approved substitute).  But under the

20

SNAP Guidance, these users may now either retrofit existing equipment to use HFCs or purchase new HFC-using equipment.[4]  Because these systems leak, greater use of HFCs will result in increased HFC emissions both nationally and in State Petitioners' states.  *See* 80 Fed. Reg. at 42,879.  Nationally, State Petitioners conservatively estimate that the SNAP Guidance will result, in the aggregate, in an additional 199.1 million metric tons of carbon dioxide-equivalent emissions by 2030—the emissions equivalent of over forty-two million passenger vehicles driven for one year or the annual energy use for more than twenty-one million homes.  *See* Gallagher Decl. at ¶ 7.  More than eleven million metric tons of carbon dioxide-equivalent emissions will be released in New York State alone.  *See id.*

---

[4]    And they likely will.   EPA's own materials show there is a substantial likelihood that current users of ozone-depleting substances in the retail food refrigeration end-use will either retrofit existing equipment with HFC-based refrigerants or purchase new HFC-using equipment.  *See* EPA-HQ-OAR-201-0198, Market Characterization of the U.S. Aerosols Industry, U.S. Motor Vehicle Air Conditioning Industry, U.S. Commercial Refrigeration Industry, and U.S. Foams Industry (July 2015) at 36, JA__; Gallagher Decl. at ¶¶ 8–9 (noting that HFCs currently comprise ninety-seven percent of all emissions from substitutes for ozone-depleting substances).

21

## B. Increased HFC Emissions Will Injure State Petitioners' Proprietary Interests

EPA's decision to abrogate the 2015 Rule's HFC listing changes will harm State Petitioners in their proprietary capacities by forcing State Petitioners with greenhouse gas emissions-reduction mandates or targets to expend scarce state resources to meet their obligations. Sea-level rise and other harms associated with worsening climate change also pose a threat to some State Petitioners' coastal property and infrastructure.

Recognizing the threat climate change poses to their inhabitants' health and well-being and to state-owned real property and infrastructure, several State Petitioners have set greenhouse gas emissions-reduction mandates or targets. New York, for example, has pledged to reduce in-state greenhouse gas emissions by forty percent below 1990 levels by 2030 and eighty percent below 1990 levels by 2050. *See* N.Y. Exec. Order 166 (2017), JA__. Other States have adopted similar policies. *See, e.g.*, Mass. Gen. Laws ch. 21N, §§ 3(b), 4(a) (mandating greenhouse gas reductions); Wash. Rev. Code § 70.235.020(1)(a) (same).

22

Because the SNAP Guidance will result in increased HFC emissions, it will hinder and disrupt New York's and other State Petitioners' efforts to reduce in-state greenhouse gas emissions in accordance with their state laws and policies. Unable to rely on the portions of the 2015 Rule specifically upheld by this Court, these State Petitioners must now procure additional reductions by other means, including through the exercise of state-law regulatory authority. In New York for example, the State Department of Environmental Conservation will soon begin notice-and-comment rulemaking to limit HFC use under New York law, specifically to compensate for the rollback effected by the SNAP Guidance. *See* Declaration of Jared Snyder ("Snyder Decl.") at ¶¶ 20–23. Such exercises of state-law regulatory authority will be time-consuming, burdensome, and expensive, *see id.* at ¶ 24, but will be unnecessary in the event the Guidance is vacated. These proprietary harms constitute a cognizable injury for standing purposes. *See West Virginia v. EPA*, 362 F.3d 861, 868 (D.C. Cir. 2004) (EPA action placing administrative burden on states constitutes injury in fact).

Separately, because HFCs are potent greenhouse gases, increased HFC emissions attributable to the SNAP Guidance will harm State

23

Petitioners by exacerbating climate change-related damage to publicly owned property and infrastructure. For example, as global warming causes sea levels to rise, the extent and magnitude of coastal flooding will increase. *See* Snyder Decl. at ¶ 30. In New York, where sea levels have already risen some twelve inches over the last century, dozens of state-owned coastal parks are at increased risk from climate change-related flooding and associated infrastructure damage. *See id.* This proprietary harm, redressable through vacatur, constitutes a cognizable injury and serves as an additional ground for State Petitioners' standing. *See Massachusetts v. EPA*, 549 U.S. 497, 519 (2007); *Air Alliance Houston v. EPA*, No. 17-1155, 2018 WL 4000490, at *6 (D.C. Cir. Aug. 17, 2018).

## C.  Increased HFC Emissions Will Injure State Petitioners' Quasi-sovereign Interests

The SNAP Guidance will also do concrete harm to the health and well-being of State Petitioners' inhabitants by increasing climate-harming HFC emissions.

Increased HFC emissions will exacerbate climate change and its associated harms, including drought, sea level rise, coastal flooding, and increases in ambient ozone levels and in the frequency and severity of extreme weather events. *See* Snyder Decl. at ¶¶ 29–40. Vacatur of the

24

SNAP Guidance would avoid these emissions increases and help to mitigate the "serious and well[-]recognized harm" associated with them.[5] *Massachusetts*, 549 U.S. at 521. Accordingly, State Petitioners have *parens patriae* standing to challenge the SNAP Guidance. *See id.* at 516–21.

## ARGUMENT

## POINT I

## EPA UNLAWFULLY ISSUED THE SNAP GUIDANCE WITHOUT NOTICE AND AN OPPORTUNITY FOR PUBLIC COMMENT

Under section 307(d) of the Clean Air Act, any "promulgation or revision of regulations under [Title] VI of [the Act]" is subject to notice and public comment. 42 U.S.C. § 7607(d). Here, this Court's *Mexichem* decision vacated the 2015 Rule's HFC use restrictions only as applied to users that had already switched to an approved substitute; the Court specifically upheld the Rule's HFC use restrictions insofar as they

---

[5] On a global scale, reduction of HFC emissions is critical. According to a recent report from the Intergovernmental Panel on Climate Change, HFC emissions rates must be reduced seventy-five to eighty percent below 2010 levels as part of any comprehensive strategy to avoid warming the earth by more than 1.5°C. *See* IPCC, Global Warming of 1.5°C at 2-38 (Oct. 2018), http://report.ipcc.ch/sr15/pdf/sr15_chapter2.pdf.

25

applied to current users of ozone-depleting substances. The SNAP Guidance expressly goes beyond this Court's ruling and substantively alters the underlying regulatory scheme by abrogating even the aspects of the 2015 Rule upheld by the Court. As both a final agency action and a substantive revision of an earlier regulation, the SNAP Guidance is subject to the Act's notice-and-comment requirements. EPA's failure to provide notice or an opportunity for public comment renders the SNAP Guidance unlawful. *See id.* § 7607(d)(9)(D).

## A. The SNAP Guidance Is a Final Agency Action Subject To Judicial Review

Section 307(b)(1) makes reviewable in this Court "any . . . nationally applicable regulations promulgated, or final action taken, by the [EPA] Administrator" under the Clean Air Act. *Id.* § 7607(b)(1). Because the SNAP Guidance represents EPA's definitive position on the applicability of the HFC listing changes in the 2015 Rule in the wake of the Court's decision in *Mexichem* and because it determines legal rights and obligations for regulated entities subject to the Rule, it is a final agency action subject to judicial review under section 307.

The test for determining whether an EPA action is final for section 307(b)(1) purposes is coextensive with the test for determining whether

26

agency action is final under the Administrative Procedure Act ("APA"). *See Whitman v. American Trucking Ass'n*, 531 U.S. 457, 478 (2001). An agency action is final when two conditions are satisfied: "First, the action must mark the consummation of the agency's decisionmaking process— it must not be merely tentative or interlocutory in nature. And second, the action must be one by which rights or obligations have been determined, or from which legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997) (internal quotation marks and citations omitted). Agency guidance documents "reflecting a settled agency position and having legal consequences for those subject to regulation may constitute 'final agency action' for purposes of judicial review." *Barrick Goldstrike Mines, Inc. v. Browner*, 215 F.3d 45, 48 (D.C. Cir. 2000); *see Natural Resources Defense Council v. EPA*, 643 F.3d 311, 319–20 (D.C. Cir. 2011).

The SNAP Guidance satisfies both steps of the *Bennett* analysis. At step one, by its terms, the Guidance represents EPA's definitive position on the applicability of the HFC listing changes in the 2015 Rule. The stated purpose of the Guidance is to explain how EPA plans to enforce the 2015 Rule's HFC listing changes in the wake of the *Mexichem* partial

27

vacatur. *See* 83 Fed. Reg. at 18,432–33. The answer, categorically, is that it will enforce none of them: "EPA *will not apply* the HFC use restrictions or unacceptability listings in the 2015 Rule *for any purpose*." *Id.* at 18,433 (emphases added). There is nothing tentative or interlocutory about EPA's position—to the contrary, the SNAP Guidance expressly writes the HFC listing changes out of the 2015 Rule "in their entirety." *Id.* at 18,435.

That EPA proposes to revise the HFC listings through future rulemaking makes the SNAP Guidance no less final. As this Court has held, "'[t]he fact that a law may be altered in the future has nothing to do with whether it is subject to judicial review at the moment.'" *General Electric Co.*, 290 F.3d at 380 (quoting *Appalachian Power Co. v. EPA*, 208 F.3d 1015, 1022 (D.C. Cir. 2000)) (rejecting EPA's argument that guidance was nonfinal because it was subject to change). Whether or not EPA intends to revise the 2015 Rule in the future (and it has yet to even propose doing so), the SNAP Guidance represents the agency's definitive position on the inapplicability of the 2015 Rule's HFC listing changes *now*.

28

At step two of the *Bennett* analysis, the SNAP Guidance "ha[s] legal consequences for those subject to regulation" under the 2015 Rule. *Barrick*, 215 F.3d at 48. The 2015 Rule reclassified certain HFCs either as unacceptable substitutes for ozone-depleting substances or as acceptable substitutes subject to use restrictions or narrowed use limits for users in various end-uses in the aerosols, foam blowing, and refrigeration and air conditioning sectors. *See* 80 Fed. Reg. at 42,871. Affected users of ozone-depleting substances thus were barred from using HFCs in a manner inconsistent with the 2015 Rule's HFC listing changes. *See* 40 C.F.R. § 82.174(d). While this Court vacated the 2015 Rule in part, it upheld the Rule's HFC use restrictions insofar as they apply to current users of ozone-depleting substances in the relevant end-uses.

The SNAP Guidance, however, goes beyond the *Mexichem* partial vacatur to abrogate the 2015 Rule's HFC listing changes in their entirety, even as to current users of ozone-depleting substances. *See* 83 Fed. Reg. at 18,435. As a result, the Guidance exempts from regulation users for which this Court afforded no relief. The SNAP Guidance thus has the legal effect of permitting HFC use that the 2015 Rule (as modified by the

29

Court's *Mexichem* decision) prohibited.  In this way, the SNAP Guidance itself determines the rights and obligations of regulated entities.

The SNAP Guidance likewise determines the rights and obligations of the agency: Under the Guidance, EPA may no longer enforce the HFC listing changes in the 2015 Rule, even as against current users of ozone-depleting substances.  This limitation alone satisfies the second *Bennett* test.  *See United States Army Corps of Engineers v. Hawkes Co., Inc.*, 136 S.Ct. 1807, 1814 (2016); *Natural Resources Defense Council v. EPA*, 643 F.3d 311, 320 (D.C. Cir. 2011).  Because the SNAP Guidance satisfies both steps of the *Bennett* analysis, it is a final agency action subject to judicial review.[6]

## B.   The SNAP Guidance Is a Legislative Rule Subject To Notice-and-Comment Requirements

Where, as here, the agency action in question is "clearly final, the question whether [it] 'is a legislative rule that required notice and comment[] is easy.'"  *Sierra Club v. EPA*, 699 F.3d 530, 535 (D.C. Cir.

---

[6]  Further, because the SNAP Guidance is final and because State Petitioners' claims are purely legal, *see Cement Kiln Recycling Coalition v. EPA*, 493 F.3d 207, 215 (D.C. Cir. 2007), State Petitioners' claims are also ripe for review.  *See Natural Resources Defense Council*, 643 F.3d at 320.

2012) (quoting *NRDC v. EPA*, 643 F.3d at 320). Because it meaningfully changes the legal landscape for both regulated entities and EPA by abrogating the HFC listing changes in the 2015 Rule as applied to all users (including current users of ozone-depleting substances), the SNAP Guidance is a legislative rule subject to notice-and-comment requirements. *See Sierra Club v. EPA*, 873 F.3d 946, 952 (D.C. Cir. 2017); *American Mining Congress v. Mine Safety & Health Administration*, 995 F.2d 1106, 1109 (D.C. Cir. 1993).

Whether an agency action is a legislative rule—and, thus, whether it must be promulgated in accordance with mandatory rulemaking procedures—"depends on 'whether the agency action binds private parties or the agency itself with the force of law." *Catawba Cty., North Carolina v. EPA*, 571 F.3d 20, 33 (D.C. Cir. 2009) (quoting *General Electric Co.*, 290 F.3d at 382); *see Molycorp, Inc. v. EPA*, 197 F.3d 543, 545 (D.C. Cir. 1999). Agency action binds with the force of law where it "expresses a change in substantive law or policy (that is not an interpretation) which the agency intends to make binding[] or administers with binding effect." *General Electric Co.*, 290 F.3d at 382–83 (internal quotation marks and citation omitted). "[I]f the language of

31

the document is such that private parties can rely on it as a norm or safe harbor by which to shape their actions, it can be binding as a practical matter." *Id.* at 383; *see American Mining Congress*, 995 F.3d at 1110 ("[T]he legislative or interpretive status of . . . agency rules turns not in some general sense on the narrowness or breadth of the statutory [or regulatory] term in question, but on the prior existence or non-existence of legal duties and rights.").

Here, as discussed above, the SNAP Guidance affects the rights and obligations of regulated entities and EPA alike in ways that are not compelled by the *Mexichem* decision and that conflict with the 2015 Rule. Specifically, the Guidance exceeds the scope of the *Mexichem* partial vacatur by abrogating the 2015 Rule's HFC listing changes not only for users that had already replaced ozone-depleting substances with HFCs (as *Mexichem* required) but also for users that still employ ozone-depleting substances. This Court squarely upheld the 2015 Rule's application to this latter subset of users, expressly holding that "EPA has statutory authority under [s]ection 612(c) to prohibit any manufacturers that still use ozone-depleting substances that are covered under Title VI

32

from deciding in the future to replace those substances with HFCs." *Mexichem*, 866 F.3d at 460.

Contrary to that holding and to the portions of the 2015 Rule the Court left in place, the SNAP Guidance authorizes current users of ozone-depleting substances to either retrofit existing equipment to use HFCs or to install new HFC-using equipment. That these direct legal consequences flow from the SNAP Guidance itself, beyond what was imposed either by the 2015 Rule or the *Mexichem* decision, establishes that the Guidance is a legislative rule subject to notice-and-comment requirements.

## C. EPA Unlawfully Issued the SNAP Guidance Without Notice Or an Opportunity for Public Comment

Under section 307(d) of the Act, the "promulgation or revision of regulations under [Title VI]" is subject to mandatory rulemaking procedures, including notice and an opportunity for public comment. *See* 42 U.S.C. § 7607(d)(1)(I), (d)(3), (d)(5), (d)(6); *see also Perez*, 135 S.Ct. at 1206 ("[A]gencies [must] use the same procedures when the amend or repeal a rule as they used to issue the rule in the first instance."); *Clean Air Council*, 862 F.3d at 9.

33

Here, there is no dispute that EPA failed to provide notice and an opportunity for public comment before issuing the SNAP Guidance. EPA's failure to follow statutorily mandated process requires vacatur of the SNAP Guidance. *See Small Refiner Lead Phase-Down Task Force v. EPA*, 705 F.2d 506, 523 (D.C. Cir. 1983) (there is no reasoned basis for ignoring statutorily mandated procedures).

EPA's procedural failure is not harmless error. "[A]n utter failure to comply with notice and comment [requirements] cannot be considered harmless *if there is any uncertainty at all* as to the effect of that failure." *Sugar Cane Growers Co-op of Florida v. Veneman*, 289 F.3d 89, 96 (D.C. Cir. 2002) (emphasis added). Had State Petitioners been afforded the opportunity to comment on the SNAP Guidance, they would, at a minimum, have (1) observed that the *Mexichem* Court *rejected* challenges to the substantive validity of the 2015 Rule's HFC listing changes; (2) objected that the Guidance unnecessarily neutralized protective HFC use restrictions for users to which the 2015 Rule should still apply, even under the *Mexichem* decision; and (3) identified ways EPA might implement the *Mexichem* partial vacatur without compromising the 2015 Rule's applicability to regulated entities still using ozone-depleting

34

substances.  Accordingly, because there is considerable uncertainty as to the effect of EPA's procedural failure, its error is not harmless.  To the contrary, EPA's procedural error was "so serious and related to matters of such central relevance to the rule that there is a substantial likelihood . . . the rule would have been significantly changed if [the error] had not been made."  42 U.S.C. § 7607(d)(8).

Finally, while section 307(d) exempts EPA from notice-and-comment requirements in two particular situations, EPA cited neither available exception in the SNAP Guidance and so cannot rely on them now.  *See Williams Gas Processing – Gulf Coast Co., L.P. v. FERC*, 373 F.3d 1335, 1345 (D.C. Cir. 2004) ("[W]e may uphold agency orders based only on reasoning that is fairly stated by the agency in the order under review").  In any event, the exceptions are inapplicable. The first exception applies only to "interpretative rules, general statements of policy, or rules of agency organization, procedure, or practice."  5 U.S.C. § 553(b)(A).  For the reasons discussed above, the SNAP Guidance is a legislative rule, not an interpretive rule, policy statement, or statement of agency procedure.  The second exception applies only "when the agency for good cause finds . . . that notice and public procedure thereon are

35

impracticable, unnecessary, or contrary to the public interest." *Id.* §
553(b)(B).  Here, EPA made no such finding.

In sum, EPA's failure to follow statutorily mandated notice-and-
comment procedures in issuing the SNAP Guidance renders the
Guidance procedurally defective, requiring vacatur.  *See id.* §
7607(d)(9)(D); *General Electric Co.*, 290 F.3d at 385.

**POINT II**

**THE SNAP GUIDANCE IS ARBITRARY AND
CAPRICIOUS**

Even if the SNAP Guidance were procedurally valid, vacatur would
still be required because EPA failed to provide a reasoned explanation for
its decision not to enforce the HFC listing changes in the 2015 Rule as
against any user.  *See* 42 U.S.C. § 7607(d)(9)(A).

EPA is free to change position, but it may not do so without
providing a reasoned explanation for the change.  *See Encino Motorcars,
LLC*, 136 S.Ct. at 2125; *Motor Vehicle Manufacturers' Ass'n v. State Farm
Mutual Insurance Co.*, 463 U.S. 29, 43 (1983).  To change existing policy,
EPA "must at least display awareness that it is changing position and
show that there are good reasons for the new policy," *Encino Motorcars,
LLC*, 136 S.Ct. at 2126; it "may not . . . depart from a prior policy *sub*

36

*silentio* or simply disregard rules that are still on the books." *Fox Televisions Stations, Inc.*, 556 U.S. at 515.

Here, EPA justified the SNAP Guidance as a response to this Court's decision in *Mexichem*. As explained, however, *Mexichem* vacated the application of the 2015 Rule's HFC listing only as to *former* users of ozone-depleting substances—that is, users that had already switched to HFCs. *See Mexichem*, 866 F.3d at 457 n.1, 462. EPA's abrogation of the HFC listing changes in the 2015 Rule as to *all* users subject to the Rule, including current users of ozone-depleting substances, thus plainly exceeds the relief this Court ordered. EPA cannot support its broad abrogation of the 2015 Rule based on a judicial decision that only narrowly vacated that regulation as applied to certain regulated entities and otherwise upheld it.

EPA appears to argue that its wholesale abandonment of the 2015 Rule is justified because there questions about how precisely to revise its existing regulations to implement the Court's partial vacatur. *See* 83 Fed. Reg. at 18,433–34. This purported concern is unsubstantiated. In both the 1994 and 2015 rulemakings, EPA was able to give unambiguous guidance on what it believed was the application of its listing decisions

37

to current and former users of ozone-depleting substances.  *See, e.g.*, 59 Fed. Reg. at 13,048; 80 Fed. Reg. at 42,936.  Indeed, that guidance was sufficiently clear to support industry petitioners' challenge in *Mexichem* and to provide a basis for this Court to distinguish between "manufacturers that still use ozone-depleting substances" and manufacturers that use "substances that are not ozone depleting," like HFCs.  *Mexichem*, 866 F.3d at 460.  Consistent with past practice, for instance, EPA could straightforwardly implement *Mexichem* by issuing guidance stating that the 2015 Rule's prohibition on HFC use does not apply to users that have *already* switched away from ozone-depleting substances as of the effective date of the listing change.  EPA's decision to forgo such guidance here—and instead to adopt a far more sweeping rescission of the 2015 Rule—is thus unreasonable.

Put another way, whatever questions there might be about the precise details of implementing *Mexichem*'s partial vacatur, those concerns would at best provide a basis for EPA to propose a new rule (which would be subject to notice-and-comment procedures).  What EPA has failed to justify here is its additional step of immediately abandoning all HFC use restrictions altogether—a result that is compelled neither by

38

*Mexichem* (in light of this Court's *partial* vacatur) nor by practical concerns (in light of EPA's ability to issue guidance conforming to *Mexichem*). The SNAP Guidance is thus a disproportionate and unreasonable response to the implementation questions EPA has identified.

The SNAP Guidance is also unreasonable because EPA made no effort to justify its new position in view of the public health and environmental goals animating the underlying statute. The 2015 Rule grew out of EPA's comparative reevaluation of its section 612 lists in light of its current understanding of the risks posed by chemicals—like HFCs—with extremely high global warming potentials and the current availability of less harmful alternatives. *See* 80 Fed. Reg. at 42,871. Since at least 2009, EPA has recognized that greenhouse gases (including HFCs) "threaten the public health and welfare [for] current and future generations." *Id.* at 42,879. HFCs were developed to be—and have commonly been used as—replacements for ozone-depleting substances subject to phase-out under the Montreal Protocol. Accordingly, absent regulatory intervention, EPA projected that "HFC emissions [will] increase substantially and at an increasing rate over the next several

39

decades." *Id.*; *see* EPA-HQ-OAR-2014-0198, Benefits of Addressing HFCs under the Montreal Protocol (June 2013) at 3, JA __. EPA estimated that, if left unchecked, HFC emissions could comprise "nearly [twenty percent] of [global] carbon dioxide emissions by 2050" and account for approximately twenty-five percent of the expected increase in radiative forcing attributable to carbon dioxide build-up in the atmosphere since 2000. EPA-HQ-OAR-2014-0198, Benefits of Addressing HFCs under the Montreal Protocol (June 2013) at 3, JA __; *see also* 80 Fed. Reg. at 42,879; Snyder Decl. at ¶ 15.

Notwithstanding the foregoing, EPA makes no attempt in the SNAP Guidance to explain why it no longer supports the detailed comparative risk analysis set forth in the 2015 Rule. Indeed, the SNAP Guidance makes no mention of climate change or its attendant harms *at all*. Because EPA has failed to even admit that it is abandoning the public health and environmental goals enunciated in section 612, let alone provide a reasoned basis for the change, the SNAP Guidance is arbitrary and capricious and must be vacated. *See Fox Television Stations, Inc.*, 556 U.S. at 515; *Air Alliance Houston*, 2018 WL 4000490 at *12–14 (EPA's failure to adequately explain change in position

40

required vacatur of new rule); *Public Citizen v. Steed*, 733 F.2d 93, 102

(D.C. Cir. 1984).

## CONCLUSION

For the reasons set forth above, the Petitions should be granted and

the SNAP Guidance vacated.

Dated:     November 7, 2018
           Albany, New York

                                    Respectfully submitted,

                                    BARBARA D. UNDERWOOD
                                      *Attorney General of the*
                                      *State of New York*
                                    Attorney for State Petitioners

                                    s/Joshua M. Tallent
                            By:     _____

                                    Joshua M. Tallent[7]
                                    Assistant Attorney General
                                    Environmental Protection
                                      Bureau
                                    The Capitol
                                    Albany, NY 12224
                                    (518) 776-2456
                                    Joshua.Tallent@ag.ny.gov

---

[7] Counsel for the State of New York represents that all parties listed in the signature block below consent to this filing.

41

STEVEN C. WU
  *Deputy Solicitor General*
MICHAEL J. MYERS
  *Senior Counsel*
MORGAN A. COSTELLO
  *Chief, Affirmative Litigation*

FOR THE STATE OF
CALIFORNIA

XAVIER BECERRA
Attorney General

s/Megan K. Hey

_____

DAVID A. ZONANA
Supervising Deputy Attorney
General
MEGAN K. HEY
Deputy Attorney General
California Department of Justice
300 S. Spring Street
Los Angeles, CA 90013
(213) 269-6000

FOR THE STATE OF
DELAWARE

MATTHEW DENN
Attorney General

s/Valerie S. Edge

_____

VALERIE S. EDGE
Deputy Attorney General
Delaware Department of Justice
102 W. Water Street
Dover, DE 19904

FOR THE STATE OF ILLINOIS

LISA MADIGAN
Attorney General

s/Daniel I. Rottenberg

_____

MATTHEW J. DUNN
Chief, Environmental Enforcement/
Asbestos Litigation Division
DANIEL I. ROTTENBERG
Assistant Attorney General
Illinois Attorney General's Office
69 W. Washington St., 18th Fl.
Chicago, IL 60602
(312) 814-3816

FOR THE COMMONWEALTH OF
MASSACHUSETTS

MAURA HEALEY
Attorney General

s/Megan M. Herzog

_____

CHRISTOPHE COURCHESNE
Assistant Attorney General and
Chief
MEGAN M. HERZOG
Special Assistant Attorney General

42

Office of the Attorney General
Environmental Protection Division
One Ashburton Place, 18th Fl.
Boston, MA 02108
(617) 727-2200

FOR THE STATE OF
MINNESOTA, BY AND
THROUGH ITS MINNESOTA
POLLUTION CONTROL
AGENCY

OFFICE OF THE ATTORNEY
GENERAL
State of Minnesota

s/Max Kieley

_____

MAX KIELEY
CHRISTINA BROWN
Assistant Attorneys General
445 Minnesota Street, Suite 900
St. Paul, MN 55101
(651) 757-1244

FOR THE STATE OF NEW
JERSEY

GURBIR S. GREWAL
Attorney General

s/Lisa J. Morelli

_____

LISA J. MORELLI
Deputy Attorney General
R.J. Hughes Justice Complex
25 Market Street
P.O. Box 093

FOR THE STATE OF OREGON

ELLEN F. ROSENBLUM
Attorney General

s/Paul Garrahan

_____

PAUL GARRAHAN
Attorney-in-Charge
Natural Resources Section
Oregon Department of Justice
1162 Court Street NE
Salem, OR 97301
(503) 947-4593

FOR THE PENNSYLVANIA
DEPARTMENT OF
ENVIRONMENTAL
PROTECTION

ALEXANDRA C. CHIARUTTINI
Chief Counsel
Pennsylvania Department of
Environmental Protection

s/Robert A. Reiley

_____

ROBERT A. REILEY

43

Trenton, NJ 08625
(609) 376-2708

Department of Environmental
Protection
Office of Chief Counsel
400 Market Street, 9th Fl.
P.O. Box 8464
Harrisburg, PA 17105
(717) 787-7060

FOR THE STATE OF
VERMONT

FOR THE DISTRICT OF
COLUMBIA

THOMAS J. DONOVAN, JR.
Attorney General

KARL A. RACINE
Attorney General

s/Nicholas F. Persampieri

s/Loren L. AliKhan

_____

_____

NICHOLAS F. PERSAMPIERI
Assistant Attorney General
Office of the Attorney General
109 State Street
Montpelier, VT 05609
(802) 828-3186

LOREN L. ALIKHAN
Solicitor General
Office of the Attorney General for
the District of Columbia
441 4th Street, NW, Suite 600
South
Washington, D.C. 20001
(202) 727-6287

FOR THE STATE OF
WASHINGTON

ROBERT W. FERGUSON
Attorney General

s/Katharine G. Shirey

_____

KATHARINE G. SHIREY
Assistant Attorney General
Ecology Division
P.O. Box 40117
Olympia, WA 98504
(360) 586-6769

44

**CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT**

I certify:

1.    This document complies with the type-volume limitations of Fed. R. App. P. 32(a)(7)(B)(i) and this Court's briefing schedule order dated October 18, 2018.  According to the word processing system used in this office, this document, exclusive of the sections excluded by Fed. R. App. P. 32(f) and Circuit Rule 32(e)(1), contains 7,697 words.  Because NRDC filed an opening brief of less than 8,000 words, the combined word count for all petitioners' briefs is less than 16,000 words.

2.    Because this document has been prepared in a proportionally spaced, 14-point typeface, it complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6).

s/Joshua M. Tallent

_____
Joshua M. Tallent
Assistant Attorney General
The Capitol
Albany, NY 12224
(518) 776-2456

45

## CERTIFICATE OF SERVICE

I certify that on November 7, 2018, the foregoing Opening Proof Brief of State Petitioners was electronically filed with the Clerk of the Court for the United States Court of Appeals for the District of Columbia Circuit through the Court's CM/ECF system, which filing effected service upon counsel of record.

s/Joshua M. Tallent

_____

Joshua M. Tallent
Assistant Attorney General
The Capitol
Albany, NY 12224
(518) 776-2456

46